IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD C. CLARK,          :         CIVIL ACTION
          Plaintiff,     :
  vs.               :         NO.  10-4063
                   :
KRAFT FOODS, INC.,       :
          Defendant.   :

DuBOIS, J.                          October 28, 2011

M E M O R A N D U M

## I.   INTRODUCTION

Plaintiff Donald Clark alleges that his former employer, defendant Kraft Foods, Inc., discriminated against him because he is African American.  Presently before the Court is Defendant's Motion for Summary Judgment.  For the following reasons, the Court denies the motion.

## II.   BACKGROUND[1]

Plaintiff, who is African American, became a Sales Representative for defendant in 2000. (Def.'s Statement Undisputed Material Facts ¶¶ 3, 10, 11.)  Sales Representatives sell, order, and distribute Kraft products to grocery stores and other retail customers within an assigned territory. (Id. ¶ 13.)  One of their duties is to rotate the Kraft products on sale in retail outlets so that they do not expire or become "out of code."  (Id. ¶¶ 15-17.)

Sales Representatives report to District Managers.  (Id. ¶ 9.)  From 2003 to July 2008, plaintiff reported to District Manager Joseph Shiller ("Shiller"), who is Caucasian; from July 2008 until his termination in August 2008, plaintiff reported to Ramon German.  (Id. ¶ 12; Pl.'s

---

[1] As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the non-moving party.

1

Ans. Def.'s Statement Undisputed Material Facts & Additional Material Facts ("Pl.'s Ans. Material Facts") ¶ 12.)

Kraft employs Merchandisers to assist Sales Representatives in "keep[ing] shelves stocked with saleable merchandise and rotat[ing] out of code items." (Def.'s Statement Undisputed Material Facts ¶¶ 19-20.) Merchandisers report to Retail Merchandising Supervisors; the Retail Merchandising Supervisor for plaintiff's territory was Robert Blinstrub ("Blinstrub"). (Id. ¶¶ 21-22, Pl.'s Ans. Material Facts ¶¶ 15, 20, 21.) The parties disagree as to how Blinstrub allocated Merchandisers. According to defendant, Blinstrub assigned Merchandisers to specific stores. (Def.'s Statement Undisputed Material Facts ¶¶ 21-32.) Plaintiff contends, however, that "[t]he general rule was that Blinstrub assigned Merchandisers to Sales Representatives," who could direct the Merchandisers' workload as they pleased, but Blinstrub deviated from his usual practice and assigned Merchandisers in plaintiff's territory to specific stores. (Pl.'s Ans. Material Facts ¶¶ 21-32.) It is plaintiff's position that Blinstrub did not interfere with the Merchandisers assigned to Caucasian Sales Representatives in this manner and that the interference undermined plaintiff's ability to service his customers adequately. (Pl.'s Mem. L. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Am. Opp'n") 9.)

**A.    Plaintiff's Disciplinary History**

Before he reported to Shiller, plaintiff "had no performance issues" and twice received Kraft's "top sales award," the Dynasty Cup. (Def.'s Statement Undisputed Material Facts ¶ 109.) Between 2003 to 2008, defendant disciplined plaintiff on several occasions due to customer complaints about plaintiff's poor communication and service. (Id. ¶¶ 33-84; Pl.'s Ans. Material Facts. ¶¶ 33-84.) These incidents generally involved those stores having either inadequate stock of Kraft products or out-of-code items. (Def.'s Statement Undisputed Material

Facts ¶¶ 60, 64.)  Plaintiff disputes what happened in some of these incidents or, in some cases,

whether defendant even disciplined him.  He claims that in many cases customers were

complaining about issues "that were not under [plaintiff's] control, such as Merchandisers not

servicing stores at all or not completing work."  (Pl.'s Ans. Material Facts ¶ 38.)

Defendant's five-step disciplinary process is: (1) verbal coaching, (2) a written

performance warning, (3) a corrective action memorandum, (4) a final warning, and (5)

termination.  (Def.'s Statement Undisputed Material Facts ¶ 34.)  Disciplinary actions lapse

when an employee has worked for a period of time – usually a year – without any further

problems.  (McTaggart Depo., Pl.'s Am. Opp'n Ex. 4, 17-18.)  Defendant used the five-step

process when customers complained about plaintiff but never went past the third step –

corrective action memorandum – until February 2008.  (Def.'s Statement Undisputed Material

Facts ¶¶ 33-75.)  Defendant rated plaintiff's performance during this period as follows: 2002-03,

good; 2003-04, exceeds expectations; 2004-05, more is expected; 2005-06, good; and 2006-07,

more is expected.  (Pl.'s Ans. Material Facts ¶¶ 162-66.)

### B.    Events Leading to Plaintiff's Termination

Defendant alleges that, after a customer complained about plaintiff in February 2008,

Shiller spoke to Senior Human Resources Manager Gary Schmidt ("Schmidt") and Regional

Retail Director Daniel McTaggart ("McTaggart").  (Def.'s Statement Undisputed Material Facts

¶¶ 76, 78, 80.)[2]  Schmidt advised Schiller that "based on [plaintiff's] discipline history, the next

appropriate discipline step was a Final Warning," step four in the five-step process.  (Id. ¶ 82.)

Shiller then issued a Final Warning to plaintiff.  (Id. ¶ 83.)  Plaintiff claims that the customer

---

[2] The races of Blinstrub, Schmidt and McTaggart are not in the record, but the parties' briefs and
the demographic data defendant reported to the Equal Employment Office imply that all three are
Caucasian.  (EEO Reports, Pl.'s Am. Opp'n Ex. 8.)  Ramon German's race is unclear.

never complained and that "Shiller fabricated at least part of the factual basis" for the discipline. (Pl.'s Am. Opp'n 11 (citing Decl. Vern Quarles,[3] Pl.'s Opp'n Ex. 24).)

In August 2008, defendant realigned its markets and changed the stores for which plaintiff was responsible. (Def.'s Statement Undisputed Material Facts ¶¶ 85-86.) Defendant audited its stores as part of the realignment and found several problems in one store, including out-of-code products and improperly displayed items. (Id. ¶¶ 88-91.) Defendant attributed these problems to plaintiff and terminated him. (Id. ¶¶ 92-95.) Plaintiff, however, avers that he was no longer responsible for that location and that the newly assigned Sales Representative, Manuel Baez, caused the problems by failing to visit the store for two to three weeks. (Id. ¶ 85.) According to plaintiff, when he took over stores from a Caucasian representative in the 2005 realignment, an audit revealed out-of-code product, but Shiller "characterized the outdated product as 'clean up'" and did not discipline the Caucasian representative. (Id.)

### C.      Plaintiff's Allegations of a Discriminatory Environment

Plaintiff contends that defendant's Horsham, Pennsylvania, office is a racially discriminatory environment. (Pl.'s Am. Opp'n 8-13.)

#### 1.      Anecdotal Evidence

Plaintiff argues that several incidents involving himself and other African American employees in the Horsham office show racial animus. These incidents include: (1) Shiller referring to plaintiff as "D.C.," which plaintiff interpreted either as a reference to historically black Washington, D.C., or as an abbreviation for "dumb cock" (Def.'s Statement Undisputed Material Facts ¶¶ 103-08); (2) Blinstrub refusing to shake his hand at a meeting (id. ¶¶ 121-26); (3) McTaggart and Shiller implicitly condoning the display of an image of a "Keebler Elf

---

[3] The Quarles declaration is unsigned and undated. Defendant has not moved to strike it from consideration. Because the Court concludes that summary judgment for defendant is inappropriate, these defects in the declaration are immaterial at this stage.

hanging by a noose from a tree," which plaintiff interpreted as a reference to the lynching of

African Americans (Pl.'s Ans. Material Facts ¶¶ 134, 158); and (4) McTaggart making racially

tinged comments to another African American Sales Representative, Allen Harris,[4] such as

repeatedly calling him "Manute Bol"[5] and telling a Caucasian employee that "Big Al will show

you how to dance" (id. ¶¶ 129-31).  Defendant claims that these events did not occur or that they

had race-neutral explanations.  (Def.'s Statement Undisputed Material Facts ¶¶ 106-07, 126;

Kraft's Resp. Pl.'s Add'l Material Facts ("Def.'s Add'l Material Facts"), Def.'s Reply Ex. C,

¶¶ 129-31, 134, 158.)

### 2.      Pattern of Discrimination

Plaintiff alleges that his superiors discriminated systematically against African American

employees.  To support this claim, plaintiff avers that: (1) the Horsham office employed

disproportionately few African American managers (Pl.'s Ans. Material Facts ¶ 127); (2)

defendant promoted unqualified Caucasians instead of qualified African Americans (id. ¶¶ 128,

140, 153); (3) "a disproportionate number of the Black male Sales Representatives . . . have been

either terminated, severely disciplined, or constructively discharged," including a

disproportionately large number of those who reported to Shiller (id. ¶ 133); (4) defendant did

not make African American employees aware of promotion or training opportunities (id. ¶¶ 137-

139, 151-52);[6] (5) Caucasian Sales Representatives received alternatives to termination during

the disciplinary process in instances where African American Sales Representatives were fired

---

[4] Harris filed a complaint against defendant, involving allegations of racial discrimination, that is currently pending before this Court.  (See Harris v. Kraft Foods Global Inc., No. 11-cv-5618.)

[5] Bol was a professional basketball player from Sudan.  Patrick McGeehan, Manute Bol, N.B.A. Player and Activist, Dies at 47, N.Y. Times, June 19, 2010, at B8.

[6] Plaintiff includes a declaration from Richard Gardenhire, another African American Sales Representative who has filed suit against Kraft.  (See Gardenhire v. Kraft Foods Global, Inc., No. 11-cv-5620.)

(id. ¶¶ 141-43); and (6) the disciplinary process perpetuated racial disparities due to management's undue deference to supervisor decisions (id. ¶¶ 145-50).  Defendant contests the facts underlying plaintiff's allegations and contends that the patterns have race-neutral explanations.  (Def.'s Add'l Material Facts ¶¶ 127-28, 133, 140-43, 145-50, 153.)

## III.  STANDARD OF REVIEW

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## IV.  DISCUSSION

Defendant asserts that it is entitled to summary judgment on the sole count of the complaint, racial discrimination under 42 U.S.C. § 1981, because plaintiff cannot show that he performed his Sales Representative duties satisfactorily, that the circumstances of his discharge

permit an inference of unlawful discrimination, or that defendant's stated reason for terminating him was pretextual.  The Court rejects these arguments.

Claims against private actors brought under § 1981 are analyzed under the same framework as Title VII discrimination claims. See Fullard v. Argus Research Labs., Inc., No. 00-509, 2001 WL 632932, at *1 (E.D. Pa. June 6, 2001) ("The legal standard for a section 1981 case is identical to the standard in a Title VII case.") (citing Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 915 n.5 (3d Cir.1983); Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999)).  The Supreme Court established the framework for evaluating summary judgment motions in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The Supreme Court further explained the framework in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Id. (quoting McDonnell Douglas, 411 U.S. at 802) (citations omitted).  Notwithstanding this burden-shifting framework, plaintiff always bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 n.10 (3d Cir. 2003); see also Burdine, 450 U.S. at 253.

To establish a prima facie discrimination case, a plaintiff must show that (1) he is a member of a protected class, (2) he satisfactorily performed the duties required by his position, (3) he suffered an adverse employment action, and (4) "under circumstances that raise an

inference of discriminatory action," the employer treated other employees more favorably.

Albright v. City of Philadelphia, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005) (quoting Sarullo, 352

F.3d at 797).  "Common circumstances giving rise to an inference of unlawful discrimination

include the hiring of someone not in the protected class as a replacement or the more favorable

treatment of similarly situated colleagues outside of the relevant class."  Bullock v. Children's

Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999).

### A.      Prima Facie Case

Defendant concedes the protected class and adverse employment action elements of the

prima facie case but contends that the other two elements – satisfactory performance of job

duties and circumstances raising an inference of discriminatory action – are not met.  (Def.'s

Mot. Summ. J. 9.)  The Court will address each of defendant's arguments in turn.

### 1.      Satisfactory Performance

Defendant argues that the record shows that plaintiff "failed to perform at the level

required for Sales Representatives" with regard to communication and ordering, delivering, and

rotating product.  (Id. at 11.)  The Court disagrees.  First, even if plaintiff's performance did not

meet some of defendant's criteria, plaintiff claims that defendants effectively set him up to fail

by not providing him with merchandising assistance and that they did so because of his race.

(Pl.'s Am. Opp'n 9.)  Second, plaintiff's performance evaluations support defendant's argument

only to the extent that they show negative ratings on metrics like "code issues, lack of

communication, and unacceptable store conditions."  (See 2005-2006 Evaluation, Pl.'s Am.

Opp'n Ex. 22, at 4; see also Annual Evaluations, Pl.'s Am. Opp'n Exs. 19-23; Kraft Disciplinary

Records, Def. Mot Summ. J., Ex. G.)  However, plaintiff often received high marks for meeting

sales objectives, (see id.), and before coming under Shiller's supervision, plaintiff received sales

awards (Def.'s Statement Undisputed Material Facts ¶ 109.).  In addition, one of plaintiff's allegations of discrimination – that Caucasian Sales Representatives received more merchandising assistance because Blinstrub did not control their Merchandisers' activities – could account for the performance evaluation deficiencies.

The parties dispute the veracity of one of the complaints that led to plaintiff receiving Final Warning status, (Pl.'s Am. Opp'n 11), and whether the August 2008 incident that led to plaintiff's termination was truly his fault (Pl.'s Ans. Material Facts ¶ 85.)  Bearing in mind that discrimination "is often simply masked in more subtle forms" and that it has "become easier to coat various forms of discrimination with the appearance of propriety," plaintiff has satisfied his burden to show that he satisfactorily performed his duties.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996).

## 2.     Inference of Discrimination

Defendant contends that plaintiff has failed to establish a prima facie case because he has not shown circumstances raising an inference of discrimination.  Defendant identifies a Caucasian Sales Representative that it terminated for "performance issues similar to [plaintiff's]."  (Def. Mot. Summ. J. 12.)  Plaintiff disputes that the situation was comparable, (Pl.'s Ans. Material Facts ¶ 96), and avers that defendant did not discipline a different Caucasian Sales Representative for an offense similar to the one that led to plaintiff's termination (Def.'s Statement Undisputed Material Facts ¶ 85).  In addition, the anecdotal evidence plaintiff proffered, particularly Regional Director McTaggart's comments regarding Allen Harris, (see Harris Decl., Pl.'s Am. Opp'n Ex. 10), supports plaintiff's contention that his supervisors harbored racial animus.  Lastly, viewing the evidence in the light most favorable to plaintiff, the alleged pattern of discriminatory treatment toward and nonpromotion of African American Sales

9

Representatives in defendant's Horsham office supports an inference that plaintiff's termination was the product of racial discrimination.  Thus, plaintiff has met the fourth element of the prima facie case.

### B.      Legitimate Nondiscriminatory Reason for Termination

Defendant avers that plaintiff's record of poor communication and customer service justified the decision to terminate his employment.  (Def.'s Mot. Summ. J. 10.)  This satisfies defendant's "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)).

### C.      Legitimate Reason as a Pretext for Discrimination

To show pretext, plaintiff must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  "Put another way, to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action . . . ."  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).  Because "the prima facie case and pretext inquiries often overlap," the Court may consider the same evidence at both stages of the McDonnell-Douglas analysis.  Id.

A genuine issue of material fact remains as to whether defendant's proffered reason for terminating plaintiff was pretextual.  Plaintiff disputes at least some of the incidents defendant cites as evidence of plaintiff's poor performance; he has challenged whether the complaint that led to his "Final Warning" was ever made; and he has produced some evidence that the incident causing his termination was not his fault and that Shiller handled a similar situation involving a Caucasian Sales Representative without disciplinary action.  (Decl. Donald Clark, Pl.'s Am. Opp'n Ex. 1, ¶¶ 28-29.)  Although plaintiff admits that some of his stores sporadically complained about poor communication or product issues, (Pl.'s Ans. Material Facts ¶¶ 33-84), a reasonable jury could credit plaintiff's contentions that those deficiencies arose from management's racially discriminatory interference with his Merchandiser scheduling (e.g., Pl.'s Ans. Material Facts ¶¶ 21-32).  Such an inference is bolstered by the evidence of racial discrimination in defendant's Horsham, Pennsylvania, office, which buttresses the theory that plaintiff's supervisors set him up to fail in the Sales Representative position by micromanaging his Merchandising schedule and not providing opportunities for advancement.

"To avoid summary judgment, the plaintiff must point to some evidence from which a factfinder could reasonably conclude that the plaintiff satisfied the criterion that the decisionmakers disapproving of him relied upon (e.g., by showing that others no more qualified than he under that criterion were not treated adversely), or that the decisionmakers did not actually rely upon that criterion."  Fuentes, 32 F.3d at 767; see also Lowe v. Phila. Newspapers, Inc., 594 F. Supp. 123, 128 (E.D. Pa. 1984) (denying summary judgment when "a jury could infer intentional discrimination[,] although the events could also be explained in a non-discriminatory way").  Plaintiff has carried that burden.  Accordingly, summary judgment for defendants is inappropriate.

## V.      CONCLUSION

A genuine issue of material fact remains as to whether defendant intentionally discriminated against plaintiff because of plaintiff's race.  Defendant's motion for summary judgment is thus denied.  An appropriate Order follows.